IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

| | |
|---|---|
| RONALD G. KIDD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION NO. 5:10-01037 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Standing Order entered August 23, 2010 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 12 and 13.)

The Plaintiff, Ronald G. Kidd (hereinafter referred to as "Claimant"), filed an application for DIB on July 19, 2007, alleging disability as of December 16, 2006, due to a "heart condition, diabetes, back injury, lung disease, residuals from left arm injury, torn rotator cup [sic] in right arm, problems with visions, injury to my neck, torn meniscus in left knee and carpel [sic] tunnel in both hands." (Tr. at 14, 73, 84, 111, 135, 144.) The claims were denied initially and upon reconsideration. (Tr. at 73-75, 82-84.) On April 23, 2008, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 85-86.) The hearing was held on March 3, 2009, before the Honorable Geraldine H. Page. (Tr. at 33-70.) By decision dated March 31, 2009, the ALJ determined that Claimant was not entitled to

benefits. (Tr. at 14-32.) The ALJ's decision became the final decision of the Commissioner on June 25, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on August 22, 2010, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2009). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f),

416.920(f) (2009). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of

> decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, December 16, 2006. (Tr. at 16, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of diabetes mellitus, degenerative disc disease of the lumbar spine status post laminectomy, degenerative joint disease of the left knee, diabetic retinopathy, chronic pain in the right shoulder, status post coronary-aorta bypass grafting surgery, and pneumoconiosis. (Tr. at 16, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 19, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light level work as follows:

> [C]laimant can lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk for 6 hours out of an 8 hour workday, and sit for 6 hours out of an 8 hour workday. He can also occasionally climb ramps and stairs, balance, kneel, crawl, stoop, crouch, and reach overhead. However, the claimant cannot be exposed to work that involves polluted environments; excessive respiratory irritants; and extreme temperature changes, nor can the claimant work around hazardous machinery; work at unprotected heights; climb ladders, ropes, scaffolds; or work on vibrating surfaces. Finally, the work must take into account the claimant's visual deficits with respect to far acuity.

(Tr. at 19-20, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 30, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a cashier and an assembler, at the light level of exertion. (Tr. at 31, Finding No. 10.) On this basis, benefits were denied. (Tr. At 32, Finding No. 11.)

Claimant's Background

Claimant was born on March 24, 1956, and was 52 years old at the time of the administrative hearing, March 3, 2009. (Tr. at 31, 39, 111.) Claimant had a high school education and received vocational training in mine maintenance machine shop. (Tr. at 31, 142, 545.) In the past, Claimant worked as a roof bolter in the coal mines. (Tr. at 30, 40, 64, 135-37.)

The Medical Record.

The undersigned has reviewed all the evidence of record, including the medical evidence of record, and briefly will address that evidence.

**Dr. Branson**:

Claimant injured his right wrist on November 22, 1999, when a rock struck the ulnar aspect of his arm. (Tr. at 331.) On exam, Dr. Philip J. Branson, M.D., noticed significant swelling, but noted that the wrist had full range of motion and was non-tender. (Id.) Dr. Branson diagnosed refractory traumatic tenosynovitis of extensor carpi ulmaris, right hand, and recommended aspiration and injection under Bier block. (Tr. at 332.)

**Dr. Muscari**:

Claimant presented to Dr. Michael Muscari, D.O., at Family Healthcare Associates, Inc., on October 24, 2001, with complaints of neck and shoulder pain following a motor vehicle accident on October 19, 2001. (Tr. at 431.) Claimant reported continued right shoulder pain on February 5, 2002. (Tr. at 428.) A MRI report dated February 8, 2002, of Claimant's right shoulder revealed AC joint hypertrophy with impingement and tendinopathy involving the supraspinatus; suspected anterior labral abnormality, possibly a tear without displacement; and long head of the biceps tendinitis suggested by

fluid encircling it within the sheath. (Tr. at 429-30.) Claimant continued to report shoulder pain through February 3, 2003.[2] (Tr. at 424-25, 427.)

**Dr. Branson**:

On April 14, 2004, Claimant again presented to Dr. Branson, with complaints of left elbow, shoulder, and forearm pain. (Tr. at 324-26.) Dr. Branson noted that Claimant was involved in a motor vehicle accident in 1979, which injured his arm, and in a workplace injury in 1981, when he dislocated his elbow. (Tr. at 324) He suffered loss of motion and function of his arm, but pain had been tolerable until six months ago. (Id.) Claimant reported that the pain radiated up into the shoulder and was increased with certain activities. (Id.) He also reported numbness down the arm into the fingers. (Id.) He rated his pain at a level ten out of ten at times, though he had not undergone any recent treatment. (Id.) On physical exam, Claimant had some weakness with external rotation of his left shoulder, fair motion with pain of his left elbow, and pain to palpation over the proximal radius of his elbow. (Tr. at 325.) X-rays revealed mild AC joint arthritis of the shoulder. (Id.) Dr. Branson diagnosed rotator cuff tendonitis versus rotator cuff tear, diabetic shoulder; chronic dislocated proximal radius with previous radial head resection, and radicular versus neuropathy of the left hand. (Tr. at 326.) He gave an injection to the shoulder and left elbow and recommended therapy. (Id.)

**Dr. Lao**:

On June 12, 2007, Claimant presented to the office of Dr. Dominador Lao, M.D., with complaints of a painful nodule on the palmar aspect of the right hand and pain on extension of the right fourth finger, especially after forward flexion. (Tr. at 264.) Claimant complained that his right fourth finger locked, especially on extension. (Id.) Dr. Lao diagnosed palmar fibrosis with Dupuytren's contracture on the right hand and scheduled him for excision and release of the trigger finger. (Tr. at

---

[2] The undersigned notes that Dr. Muscari's treatment notes are handwritten and very difficult to read. The undersigned is uncertain whether there was any further mention of neck pain to Dr. Muscari.

7

265.) On July 12, 2007, Claimant underwent excision of the palmar fibrosis from the right hand and release of tension of the fibers that wrapped around the flexor tendon of the right fourth finger. (Tr. at 269-70.) Post-operative diagnosis was Dupuytren's contracture from the palmar aspect of the right hand associated with chronic stenosing and tenosynovitis of the right fourth finger. (Tr. at 269.) Claimant tolerated the procedure well. (Tr. at 270-71.)

**Dr. Patel**:

Dr. Patel acknowledged Claimant's arm surgery on July 20, 2007 (Tr. at 232.), and Dr. Lao opined on July 24, 2007, that Claimant's trigger finger was resolved. (Tr. at 239.) Dr. Lao noted that Claimant had mild soreness and pain in the right forearm and fingers, as well as decreased grip strength and pain of the right hand. (Id.) On August 26, 2007, Claimant presented to Appalachian Regional Healthcare with complaints of left arm pain, which he rated at a level four out of ten. (Tr. at 261.)

**Dr. Rahim**:

Claimant underwent a consultative examination by Dr. Mustafa Rahim, M.D., on November 9, 2007. (Tr. at 295-98.) He reported, *inter alia*, a history of left arm injury, bilateral carpal tunnel syndrome,[3] and a torn rotator cuff on the right shoulder. (Tr. at 295.) Regarding his carpal tunnel, Claimant did not report any weakness and stated that "at least the burning pain that he has from the carpal tunnel has improved significantly after the surgery." (Id.) Respecting the torn rotator cuff, Claimant did not report any redness or swelling, noted that his range of motion had improved significantly, and that he was "fine" as long as he took his medication. (Id.) Claimant denied any anxiety, depression, suicidal thoughts or ideations, mania or hypomania, delusions, or hallucinations. (Tr. at 296.)

---

[3] Dr. Branson indicated in a treatment note dated April 23, 2002, that Claimant underwent bilateral carpal tunnel surgery in 1989 and 1993. (Tr. at 418.)

On physical exam, Claimant's neck and cervical spine was normal. (Tr. at 296-97.) Exam revealed full flexion, extension, and rotation of the cervical spine without pain or discomfort. (Tr. at 297.) His right shoulder, elbow, and wrist revealed a lack of redness or tenderness and full range of motion without pain or discomfort. (Tr. at 296-97.) Claimant was able to extend his hand fully, make a fist, and oppose his fingers. (Tr. at 297.) Though he had a scar from the surgery, there was no evidence of wasting. (Id.)

**Dr. Egnor**:

Dr. James Egnor, M.D., completed a Physical RFC Assessment on November 16, 2007, on which he opined that Claimant's secondary diagnoses of carpal tunnel and right shoulder impairment, among other diagnoses, resulted in his ability to perform light exertional level work with an unlimited ability to push or pull, occasional postural limitations, and some environmental limitations. (Tr. at 296-306.) Dr. Egnor acknowledged Claimant's CTS status post-surgical release, but noted that he had good hand function at the consultative examination. (Tr. at 304.) Dr. Egnor also acknowledged his complaints on July 31, 2007, of aching, stabbing, and throbbing pain in his hands. (Tr. at 306.) On exam, it appeared that Claimant had some limited use of his hands and complained of weak grip. (Id.) He also noted that Claimant reported having experienced panic attacks since leaving work. (Id.) Drs. Carl Bancoff, M.D., Gurcharan Singh, M.D., Karen Sarpolis, M.D., and Marcel Lambrechts, M.D. agreed with Dr. Egnor's assessment. (Tr. at 307-12, 314.)

**Dr. Rasheed**:

Claimant treated with Dr. Syed Rasheed, M.D., from September 13, 2000, through March 28, 2008, primarily for his type I diabetes mellitus, but also for some heart and other conditions. (Tr. at 436-97.) On August 27, 2007, Claimant presented with a swollen and painful left arm. (Tr. at 443.) Dr. Rasheed suspected that it could have been the result of "some insect bite or spider bite but we can not find a mark on his arm." (Id.) He noted that Claimant's arm was not very hot, but was swollen slightly.

9

(Tr. at 272.) Dr. Rasheed was unsure of the etiology, and suspected an insect bite or spider bite, for which he prescribed an antibiotic and Motrin. (Id.) Claimant's left arm condition was not referenced on his return visit on September 24, 2007. (Tr. at 442.) However, Dr. Rasheed opined in his treatment note from that day that due to Claimant's type I diabetes, premature coronary artery disease, hyperlipidemia, and hypertension; and his "multiple conditions, health problems, and recurrent episodes of hypoglycemia on an insulin pump," he was completely disabled. (Id.) Dr. Rasheed noted that it was "not advisable for him to work in the coal mines." (Id.) He recommended that he apply for his "social security and I have told him he is completely disabled." (Id.) On February 29, 2008, Dr. Rasheed noted that Claimant was anxious and irritable, which he would treat with 1 milligram of Ativan. (Tr. at 437.) On March 28, 2008, Dr. Rasheed diagnosed situational depression based on his transition to retirement, which upset him. (Tr. at 436.)

Dr. Rasheed completed a Medical Assessment of Ability to do Work-Related Activities (Physical), on January 16, 2008. (Tr. at 433-35.) He specifically noted Claimant's carpal tunnel syndrome, per Dr. Branson, and opined that it, together with his torn rotator cuff, limited his ability to reach in all directions, handle, finger, and feel. (Tr. at 434.) Dr. Rasheed further opined that Claimant could reach on less than an occasional basis, and could handle, finger, and feel on an occasional basis. (Id.)

On January 27, 2009, Dr. Rasheed noted that he was going to obtain an x-ray of Claimant's left forearm and refer him to Dr. Whitfield. (Tr. at 529.) The treatment note on this date however, is incomplete, and appears to contain only the second page of the treatment note. (Id.)

**Mr. Sargent**:

Claimant underwent a psychological evaluation on February 6, 2009, by Lester Sargent, M.A., at the request of his attorney. (Tr. at 543-52.) Claimant reported sadness, worry, anxiety, and frustration with his inability to work and perform other activities at the prior injury level. (Tr. at 544.)

He also reported recurrent distressing recollections of recovering the bodies of two co-workers in mining accidents in 2004 and 2005. (Id.) Claimant reported that he avoided conversations about the trauma, had diminished interest and participation in significant activities, and experienced feelings of attachment and a sense of a foreshortened future. (Id.) Furthermore, he reported a depressed mood for the past two weeks, associated with loss of interest in activities, unsatisfying sleep, and feelings of hopelessness, worthlessness, guilt, and failure and instability. (Id.)

Mr. Sargent administered the WAIS-III, on which Claimant achieved a Verbal IQ of 91, a Performance IQ of 89, and a Full Scale IQ of 90. (Tr. at 545-46.) On the WRAT-3, it was determined that Claimant read and performed arithmetic at the high school level. (Tr. at 547.) On mental status exam, Mr. Sargent observed that Claimant's mood was of anxiety and sadness and his affect was mildly restricted. (Tr. at 547.) Claimant was cooperative, maintained fair eye contact, exhibited coherent speech and understandable thought processes, presented no evidence of delusions or paranoia, had normal judgment and good insight, and exhibited increased psychomotor agitation. (Id.) His immediate and remote memory were within normal limits, but his recent memory was severely deficient. (Id.) Claimant's concentration and pace were within normal limits, but his persistence and social functioning were mildly deficient. (Tr. at 547-48.)

Claimant reported his activities to have included performing self-care duties without assistance, occasionally cooking, reading the newspaper, watching television, occasionally visiting with his mother, and reading his Bible before bed. (Tr. at 548.) Mr. Sargent diagnosed pain disorder associated with both psychological factors and a general medical condition and post-traumatic stress disorder, chronic. (Id.) He opined that Claimant was "incapable of maintaining gainful employment or performing any type of work-related activities at this time." (Id.) Mr. Sargent recommended further sessions to determine treatment, that Claimant participate in individual and group counseling sessions, and consider referral for anesthesiologist based pain management. (Tr. at 549.)

On February 21, 2009, Mr. Sargent completed a Mental Impairment Questionnaire RFC. (Tr. at 550-52.) He opined that Claimant's ability to perform the following activities was limited markedly: understand and remember detailed instructions, maintain attention for extended periods, maintain an ordinary routine without supervision, work in coordination or proximity to others without being unduly distracted by them, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and respond appropriately to changes in a routine work setting. (Tr. at 550-51.) He also opined that was moderately limited in his ability to remember work-like procedures, carry out detailed instructions, maintain regular attendance and be punctual within customary tolerances, interact appropriately with the general public, and set realistic goals or make plans independently of others. (Id.) He further opined that Claimant's impairments were expected to last twelve months and were expected reasonably to exacerbate his pain originating from a physical condition. (Tr. at 552.) Mr. Sargent recommended that Claimant seek treatment and participate in individual and group counseling sessions for his depressive and anxiety symptoms. (Id.)

Claimant's Challenges to the Commissioner's Decision.

Claimant alleges that the ALJ's decision is not supported by substantial evidence because the ALJ erred in failing to follow the "slight abnormality" rule when he found that Claimant's carpal tunnel, neck pain, elbow pain, depression, and post-traumatic pain disorder were not severe impairments. (Document No. 12 at 2-3.) Claimant contends that pursuant to SSR 96-3p, the specified impairments were greater than a slight abnormality and should have been considered as severe impairments. (Id. at 2.) He further contends that the ALJ failed in her duty to re-contact Claimant's medical providers to determine whether any diagnosis was rendered or medication prescribed for his mental impairments. (Id. at 3.)

In response, the Commissioner asserts that the ALJ properly determined that Claimant's carpal tunnel syndrome and neck and elbow pain were not severe impairments. (Document No. 13 at 7-9.)

The Commissioner points out that there was no diagnosis of a neck or elbow impairment during the relevant period of time, December 16, 2006, through March 31, 2009. (Id. at 8.) Though Claimant occasionally complained of neck and elbow pain, his clinical examinations were normal. (Id.) The Commissioner also points out that Claimant was not diagnosed with carpal tunnel syndrome during the relevant period. (Id.) Though Claimant indicated that he had been diagnosed with carpal tunnel syndrome, he underwent surgery in 2000, which was six years prior to the relevant period. (Id.) Because Claimant was able to perform his activities of daily living, including meal preparation, performing household repairs, and mowing the lawn, the ALJ properly determined that carpal tunnel was not a severe impairment. (Id.)

Contrary to Claimant's assertion, the Commissioner further asserts that the ALJ did not need to re-contact Claimant's medical providers. (Document No. 13 at 10.) The Commissioner asserts that the ALJ thoroughly reviewed the medical records and concluded that they contained minimal complaints of debilitating depression and anxiety, and that there were no prescriptions for psychiatric medications. (Id.) Consequently, the ALJ had no need to re-contact Claimant's medical providers. (Id.) The Commissioner interprets Claimant's arguments as a request for this Court to re-weigh the evidence and reach a different conclusion regarding his RFC, which is not a function of judicial review. (Id. at 11.)

Analysis.

1. Severe Impairments.

Claimant first alleges that the ALJ erred in not finding his neck and elbow pain and carpal tunnel syndrome to have been severe impairments. (Document No. 12 at 2-3.) To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2009). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and

speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original); see also SSR 85-28 (An impairment is considered not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered."). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

In her decision, the ALJ acknowledged Claimant's complaints of neck and elbow pain. (Tr. at 17.) She noted however, that Claimant's musculoskeletal examinations with his treating physician were normal and failed to reveal any indication of a neck or elbow impairment except when it appeared that Claimant had some sort of insect bite. (Id.) Regarding carpal tunnel syndrome, the ALJ concluded that the evidence failed to support an actual diagnosis or demonstrate Claimant's complaints of any functional limitations since his alleged onset date. (Id.) The ALJ noted that the only indication of upper extremity pain was contained in Dr. Branson's treatment records of April 14, 2004. (Tr. at 17-18.) Dr. Branson's notes however, did not suggest complaints of pain subsequent to surgery several years ago. (Tr. at 18.) Accordingly, the ALJ determined that there were no consistent documented complaints, clinical signs, or the use of prescribed medications for control of carpal tunnel syndrome, neck pain or

elbow pain. (Id.) As such, the ALJ determined that these impairments did not more than minimally impact Claimant's ability to perform work-related functions. (Id.)

The undersigned finds that contrary to Claimant's allegations, the ALJ's decision regarding neck pain, elbow pain, and carpal tunnel syndrome, is supported by the substantial evidence of record. As summarized above, Claimant complained of neck and elbow pain on occasion. However, physical exams were normal and the majority of the complaints were prior to December 16, 2006, Claimant's alleged onset date. Claimant was diagnosed with carpal tunnel syndrome prior to his alleged onset date, but the evidence revealed that Claimant's burning sensation and range of motion significantly improved after surgery, and he presented with no functional limitations. Likewise, Claimant presented with redness on his arm on at least one occasion, but it was suspected that he had some type of insect bite. He complained to Dr. Lao of pain of the right hand in June, 2007, but was diagnosed with palmar fibrosis. (Tr. at 264.) After release was performed, his "trigger finger" was resolved. (Tr. at 239.) Notwithstanding any complaints that Claimant may have had, the evidence reveals that Claimant was able to perform his activities of daily living, which included preparing light meals, mowing the lawn, performing household repairs, shopping for groceries, and riding in or driving a car on a daily basis. (Tr. at 21, 158-59.) Accordingly, the undersigned finds that the ALJ's decision that Claimant's neck pain, elbow pain, and carpal tunnel syndrome were not severe impairments, is supported by the substantial evidence of record.

Regarding Claimant's mental impairments, the undersigned further finds that the ALJ's decision that they were not severe impairments, likewise, is supported by the substantial evidence of record. In her decision, the ALJ acknowledged the diagnoses of anxiety, irritability, and situational depression. (Tr. at 18.) She further acknowledged however, that the only evidence of mental disorders was from Claimant's own consultative examiner, Mr. Sargent. (Id.) Claimant sought no mental health treatment during the relevant period of time and his complaints began approximately one year after the

start of the relevant period of time. (Tr. at 18.) The record did not indicate that Claimant was prescribed any psychiatric medication. (Id.) Furthermore, as the ALJ concluded, the evidence failed to satisfy the durational requirement of 12 months to constitute a severe impairment. (Tr. at 18.) Notwithstanding the durational requirement, the evidence failed to demonstrate a severe mental impairment. Mental testing revealed a full scale IQ of 90 and he read and performed arithmetic at the high school level. (Tr. at 547.) Mr. Sargent noted that his concentration and pace were within normal limits, but his persistence and social functioning were only mildly deficient. (Tr. at 547-48.) Despite Mr. Sargent's opinion that Claimant had several marked impairments, including maintaining attention for extended periods, the lack of longitudinal evidence, the lack of evidence as to how Claimant was affected by his mental impairments, and the inconsistency between Mr. Sargent's consultative examination notes and his opinion, the evidence failed to establish a severe mental impairment.

Contrary to Claimant's assertion, the ALJ was not required to re-contact Claimant's medical providers pursuant to 20 C.F.R. § 404.1512(e). The ALJ thoroughly reviewed the evidence of record, which revealed few mental health issues and no prescriptions for psychiatric medications. Though Claimant testified that he was taking Ativan for his panic attacks, as prescribed by his treating physician, the evidence did not demonstrate that the panic attacks prevented him from working or performing his activities. Accordingly, the undersigned finds that the ALJ's decision is supported by the substantial evidence of record.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 12.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 1, 2012.

R. Clarke VanDervort
United States Magistrate Judge